# Exhibit D

# 8-9-19 Recruitment Processing Outsourcing Agreement



**RECRUITMENT PROCESSING OUTSOURCING AGREEMENT**

THIS RECRUITMENT PROCESSING OUTSOURCING AGREEMENT ("**Agreement**") is entered into as of this 12th day of April, 2019 ("**Effective Date**") between Allegis Global Solutions, Inc. ("**AGS**"), a Maryland corporation, having a place of business at 7312 Parkway Drive, Hanover, MD 21076, and Pomeroy IT Solutions Sales Company, Inc., d/b/a Getronics ("**Customer**"), a Delaware corporation, having a place of business at 1020 Petersburg Road, Hebron, KY 41048 (each a "**Party**" and, collectively, the "**Parties**").

WHEREAS, Customer desires to obtain recruitment process outsourcing services in connection with its acquisition of permanent employees, and AGS desires to provide such services to Customer; and

WHEREAS, AGS will utilize an Applicant Tracking Software provided by the Customer that will enable the electronic handling of Candidate recruitment and allow the user to track an applicant through the selection and hiring process.

NOW, THEREFORE, Customer and AGS hereby agree as follows:

**ARTICLE I – DEFINITIONS**

1.1    As used in this Agreement, the following terms shall have the meanings specified below unless the context otherwise requires. Capitalized terms, acronyms and phrases used in the staffing industry (i.e. HR) and business process outsourcing services industries or other pertinent business context that are not defined will be interpreted in accordance with their then-generally understood meaning:

"**Account Director**" means the individual assigned by AGS to manage the Program.

"**Affiliate**" means those entities or parties controlling, controlled by or under common control with a Party.

"**Agreement**" means this Recruitment Process Outsourcing Agreement entered into as of the date first above written between AGS and Customer, including all Schedules attached hereto, and all Statement(s) of Work entered into by AGS and Customer pursuant to Section 3.1.

"**AGS Technology**" has the meaning given such term in Section 9.1.

"**Applicant Tracking Software**" or "**ATS**" means a web-based application software program provided by the Customer and utilized by AGS in conjunction with the Services.

"**ATS Provider**" means the third party licensor of the Applicant Tracking Software.

"**Confidential Information**" has the meaning given such term in Section 9.2.

"**Candidate**" means an individual candidate submitted by AGS to Customer to evaluate for hire as a permanent employee pursuant to an approved Job Order.

"**Customer Account Manager**" has the meaning given such term in Section 3.6.

"**Customer Information**" has the meaning given such term in Section 8.1.

"**Deliverable**" means tangible work product, if any, delivered by AGS to Customer as part of the Services.

"**Data Protection Laws**" means all worldwide data protection and privacy laws and regulations applicable to the personal data in question, including, where applicable, EU Data Protection Law.

"**Dispute Resolution Process**" has the meaning given such term in Article VI.

"**Force Majeure Event**" has the meaning given such term in Section 13.7.

"**Hired Candidate**" means any Candidate hired as a permanent employee by Customer.

"**Hired Candidate Fee**" means the fee charged by AGS to Customer for a Hired Candidate, which fee is described in more detail in the applicable Statement of Work.

"**Hiring Manager(s)**" means the Customer employee or employees responsible for requesting Candidate(s) for open Job Orders.

"**Implementation**" has the meaning given such term in Section 3.5.

"**Implementation Fee**" means the fee charged by AGS to Customer for Implementation, which fee is described in more detail in the applicable Statement of Work.

"**Initial Term**" has the meaning given such term in Section 2.1.

"**Intellectual Property**" means, collectively, all intellectual property rights, including (i) patents, patent applications, trademarks (whether registered or unregistered), trademark applications, trade names, service marks (whether registered or unregistered), service mark applications, copyrights (whether registered or unregistered), copyright applications, trade secrets, proprietary information, know-how, processes, technology, development tools, ideas, concepts, design rights, moral rights, data base rights, methodologies, algorithms or inventions, (ii) any right to use or exploit any of the foregoing, and (iii) any other proprietary rights or intangible assets (including software).

"**Job Order**" means an electronic request entered into the Applicant Tracking Software that sets forth a job opening for which the Customer desires a Hired Candidate.

"**Management Fee**" means the fee charged by AGS to Customer for the Services, which fee is described in more detail in the applicable Statement of Work.

"**Program**" means the program under which AGS provides the Services under this Agreement.

"**Program Office**" means the office staffed by AGS employees through which AGS provides the Services.

"**Security Incident**" means any unauthorized disclosure, use, processing or destruction of Customer Information.

"**Services**" means the recruitment process outsourcing services described in the applicable Statement of Work, which generally shall consist of the recruitment and placement of Candidates to work as a permanent employee for Customer.

Recruitment Process Outsourcing Agreement -
Proprietary and Confidential: V 01 02 2019

"**Statement of Work**" **or** "**SOW**" means a statement of work describing the Services entered into by Customer and AGS in accordance with Section 3.1.

"**Term**" has the meaning given such term in Section 2.1.

"**Transaction Taxes**" means sales, use, excise, value-added, gross receipts, services, consumption and/or other similar transaction taxes, however designated, that are levied by any taxing authority upon the Services provided by AGS to Customer.

**ARTICLE II – TERM**

2.1.   **Term –** The term of this Agreement will commence on the Effective Date, and shall continue for a period of three (3) years (the "**Initial Term**"), unless earlier terminated by either Party in accordance with the terms of this Agreement.  This Agreement may only be renewed by the mutual written agreement of the Parties (each, is a "**Renewal Term**"). Collectively, the Initial Term and the Renewal Term(s) shall be referred to as the "**Term**". For each Renewal Term, unless the Parties otherwise agree in writing, the Agreement will extend on the same terms and conditions.

**ARTICLE III – OBLIGATIONS OF THE PARTIES**

3.1.   **Services; Statement of Work –**AGS agrees to provide the Services to Customer in accordance with this Agreement, the applicable Statement of Work and the applicable Country Participant Agreement. The Services (and each Party's respective obligations with respect to the Services) shall be described more fully in one or more written Statements of Work referencing this Agreement and executed by both Customer and AGS. Each such Statement of Work shall be made part of and appended to this Agreement.

3.2.   **Country Participant Agreements** - Customer and AGS agree that this Agreement will serve as the basis for any mutually agreed-upon Services outside of the United States.  Where necessary or appropriate, in order for AGS to provide the Services in a particular country or region, the local in-country Affiliate of each respective Party shall enter into a mutually agreed upon country participant agreement ("**Country Participant Agreement**") in a form substantially similar to Exhibit B (Country Participant Agreement) attached hereto and incorporated herein.  Each Country Participant Agreement shall amend the terms and conditions of this Agreement only to the extent necessary to comply with local laws, local tax regulations, or other local regulatory requirements or practices.

3.3.   **Job Orders –** Customer may enter Job Orders into the Applicant Tracking Software. Each Job Order shall include a complete and accurate description of the requirements for each open position, a detailed description of the duties to be performed by a successful Candidate, a detailed description of the compensation range to be paid to a successful Candidate and such additional information as AGS may reasonably request.

3.4.   **Applicant Tracking Software** - Customer will provide all AGS personnel access to the ATS and any other Customer systems necessary for AGS to provide the Services to Customer.  Customer will take all steps necessary to ensure that the information contained therein is true and accurate.  Customer shall be responsible for obtaining from the ATS Provider a license that permits Customer and AGS to use the ATS in the manner contemplated by this Agreement. Customer shall cause the ATS Provider to make the ATS available to, and cooperate with, AGS during the Term, at no additional cost to AGS, so that AGS may perform its obligations under this Agreement. AGS agrees to execute such documentation as the ATS

Provider may reasonably request to govern AGS's use of the ATS. In the event Customer decides to change the ATS Provider or the ATS at any time during the Term, Customer shall notify AGS of such decision, and AGS and Customer shall cooperate to effect an orderly transition of the ATS Provider or ATS, as applicable, to the new ATS Provider or ATS, as applicable. Should such transition adversely impact the ability of AGS to perform any of its obligations under this Agreement, AGS shall be excused from such performance to the extent of such impact.

3.5.     **Implementation** – AGS and Customer shall cooperate to effect an orderly and timely transition of Customer's recruiting process and oversight function to AGS ("**Implementation")** no later than ten (10) weeks following the Effective Date ("**Expected Implementation Period**") and in accordance with the Statement of Work.

3.6.     **Account Management –** AGS will assign an AGS employee to be the Account Director. The Account Director will have primary operational responsibility for the Services, including all personnel used in performing Services, and will serve as AGS' primary liaison with Customer. Customer shall have the right to reasonably approve the initial AGS' Account Director, which approval by Customer shall not be unreasonably withheld, conditioned or delayed.  If Customer is dissatisfied with the Account Director for any lawful reason, Customer shall notify AGS in writing and the Parties shall meet in good faith to discuss a resolution. If the Parties mutually agree that the Account Director shall be replaced, Customer shall have the right to reasonably approve such replacement Account Director, which approval by Customer shall not be unreasonably withheld, conditioned or delayed. Customer will assign a Customer employee (the "**Customer Account Manager**") to be Customer's primary liaison with AGS.

3.7.     **Records –** If requested by Customer in writing, AGS will provide Customer with applicable records and reports with respect to the Services.  Such records shall include, but shall not be limited to, payment records, attendance cards, time sheets, and job summaries.  The cost of such request shall be the responsibility of Customer; provided, however, if the records show an overpayment of fees by more than five percent (5%) under this Agreement, AGS shall be responsible for the cost of the request, in addition to refunding to Customer any such overpayment amounts.  The provision of such records shall be for the purpose of confirming amounts billed to Customer under this Agreement. The rights and obligations set forth in this Section 3.7 shall survive for one (1) year after the expiration or earlier termination of this Agreement.

3.8.     **Compliance with  Laws –** AGS shall comply with all applicable  federal, state, and local laws, regulations, and ordinances, including any Data Protection Laws to the extent such laws are applicable to AGS' performance of the Services provided hereunder in such jurisdiction where the Services are being provided, and AGS will be responsible for any fees, permits, payments, and taxes that may be required for AGS' performance of the Services provided hereunder. Customer shall comply with all applicable federal, state, and local laws, regulations, and ordinances, including any Data Protection Laws to the extent such laws are applicable to Customer's receipt and use of the Services in the jurisdiction where the Services are being received.

3.9.     **Customer Responsibilities** - In addition to payment of the fees in accordance with the terms of this Agreement and the applicable Statement of Work, Customer is responsible for performing the Customer responsibilities set forth in this Agreement (the "**Customer Responsibilities**"). The Customer Responsibilities include (A) providing reasonable cooperation to AGS so that AGS may perform the Services in accordance with the terms of this Agreement, including making its personnel available to AGS, (B) performing its obligations related to Implementation and completing Implementation during the

Recruitment Process Outsourcing Agreement -
Proprietary and Confidential: V 01 02 2019

Expected Implementation Period, (C) obtaining consent from third parties necessary for AGS to provide the Services, (D) providing time-sensitive approvals and decisions, (E) providing a workplace that complies with applicable statutes, regulations, and ordinances, including but not limited to OSHA and the ADA; and (F) providing safety training and information (including regarding potential exposure to hazardous substances), instruction and supervision in an attended environment with appropriate internal safeguards. As part of Customer's responsibility for its receipt of the Services, Customer will substantiate that the scope of each of the Services as set forth in the Statements of Work meets Customer's operational, technical and other requirements.

3.10.     **Prevention of Performance** - AGS's delay in performing or failure to perform its obligations will be excused to the extent such delay or failure is caused by: (A) Customer's failure or delay in performing any Customer Responsibilities or any material obligation in connection with this Agreement; (B) any actual or alleged infringement of the proprietary rights or information of a third party by Customer or any of its Affiliates; or (C) Customer's or its employees, agents or contractors tortious acts or omissions, intentional misconduct, fraud or violation of declaration, decree, directive, legislative enactment, order, ordinance, regulation, rule or other binding restriction of or by any federal, state, municipal, local, territorial or other governmental department, regulatory authority, judicial or administrative body. AGS may charge Customer for any reasonable increase in costs it actually incurs in performing the Services resulting from any of the circumstances described in this Section.

3.11.     **Customer Delays in Implementation** – Customer acknowledges that AGS may charge an Implementation Fee as set forth in the applicable SOW in connection with the Implementation and that such Implementation Fee is based on an Implementation timeline equal to the Expected Implementation Period. If Implementation is not completed by the expiration of the Expected Implementation Period and such delay is solely due to Customer's failure to comply with its obligations under this Agreement (a "**Customer Delay**") then, on a monthly basis, Customer agrees to reimburse AGS its actual and reasonable costs incurred as a direct result of the Customer Delay until such time as Implementation is complete.  Such costs will include reasonable AGS personnel costs, third-party expenses and other such reasonable costs.

3.12.     **Authorizations** - Customer will obtain, maintain and comply with all licenses, consents, permits, approvals and authorizations that are authorizations to perform its obligations under this Agreement and allow AGS to perform the Services for its benefit, including those necessary to allow AGS to access and use Customer's owned and leased assets, and any software, services, documentation or other tools subject to third-party contracts.

## ARTICLE IV – INVOICING AND PAYMENT

4.1.     **General** – AGS will submit monthly invoices to Customer, and Customer shall pay such invoices, in accordance with the applicable Statement of Work.

## ARTICLE V – RELATIONSHIP OF PARTIES

5.1.     **Independent Contractor** – The Parties intend to create an independent contractor relationship and nothing contained in this Agreement shall be construed to make either Customer or AGS partners, joint ventures, principals, agents, or employees of the other; provided, however, that the foregoing shall not be construed as preventing AGS from performing any of its obligations under this Agreement.  Neither Party shall have any right, power, or authority, express or implied, to bind the other.

5.2.     **Program Office Personnel** – AGS shall treat its employees who provide Services under this Agreement as AGS employees for all purposes and shall be responsible with respect to such employees for providing any compensation or other benefits, making all appropriate tax, social security, Medicare and other withholding deductions and payments, providing worker's compensation insurance coverage, and making all appropriate unemployment tax payments.

5.3.     **Tax Returns** – AGS agrees to file all applicable tax returns, including income tax returns, employment tax returns, and information returns required by law, in a manner consistent with its status as an independent contractor and as employer of its employees providing Services under this Agreement.

5.4.     **Media Releases** – Neither party shall make any media release or public announcement (except as may be reasonably necessary for the Party to perform its obligations hereunder or as may be required by legal, accounting, or regulatory requirements) beyond the reasonable control of such Party, without the prior written consent of the other.

## ARTICLE VI –DISPUTE RESOLUTION

6.1.     **Dispute Resolution** - In the event of any dispute in connection with this Agreement, the Parties will use good faith efforts to resolve the dispute in an amicable and businesslike manner through informal discussion in accordance with the following:

(a)     The Parties will use diligent business efforts to resolve the dispute at the working level without resorting to further dispute resolution procedures.

(b)     Any dispute that is not resolved at the working level within two (2) business days may be referred by either Party to the Account Director and Customer Account Manager.

(c)     If the Account Director and Customer Account Manager have not resolved the dispute within fifteen (15) days after the dispute is referred to them, then, upon the request of either Party, the dispute will be referred to the senior executives (the "**Dispute Resolution Process**").

6.2     **No Formal Proceedings** - No judicial action or other formal proceeding or termination concerning the dispute may be commenced unless any of the following apply: (a) the senior executives have not resolved the dispute within thirty (30) days after the dispute is referred to them and the senior executive of either Party concludes in good faith that resolution of the dispute by informal discussion of the Parties is not likely; (b) a Party desires to seek an injunction or specific performance or other equitable remedy in order to prevent what the applying Party reasonably believes is necessary to prevent irreparable harm or preserve the status quo; or (c) the Dispute Resolution Process has been in process for over sixty (60) days without a resolution.

## ARTICLE VII – REPRESENTATIONS AND WARRANTIES

7.1.     **Mutual Representations and Warranties** – Each Party represents and warrants that, as of the Effective Date:

(a)     it has all necessary corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder.

(b)    this Agreement constitutes a legal, valid and binding obligation of such Party, enforceable against it in connection with its terms;

(c)    to its knowledge, it is not subject to any contractual obligation that would prevent it from entering into this Agreement, and that AGS' offer to provide the Services to Customer and Customer's acceptance of such offer in no way caused or induced either Party to breach any contractual obligation; and

(d)    it is a corporation duly incorporated, validly existing and is in good standing under the laws of the state in which it is incorporated, and is good standing in each other jurisdiction where the failure to be in good standing would have a material adverse effect on its business or its ability to perform its obligations under this Agreement.

7.2.    ***AGS Representations and Warranties*** – AGS represents and warrants to Customer that:

(a)  all Services rendered hereunder will be performed in a professional and workmanlike manner in accordance with industry standards and practices applicable to the performance of such Services; and

(b) the personnel it assigns to perform Services for Customer under this Agreement are qualified individuals with the proper training, experience, background, and skill to perform such Services.

7.3.    **Customer Representation and Warranty** – Customer represents and warrants that AGS's access to and use of the ATS as provided hereunder, and AGS' use of same in accordance with the terms of this Agreement does not and will not infringe on any Intellectual Property right of any third party.

7.4.    ***Warranty Disclaimer*** – THE WARRANTIES SET FORTH IN THIS AGREEMENT AND IN ANY STATEMENT OF WORK EXECUTED HEREUNDER CONSTITUTE THE ONLY WARRANTIES PROVIDED BY EITHER PARTY WITH RESPECT TO THIS AGREEMENT AND THE SERVICES, AND SUCH WARRANTIES ARE IN LIEU OF ALL OTHER WARRANTIES, WRITTEN OR ORAL, STATUTORY, EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHETHER ARISING BY A COURSE OF DEALING, USAGE OR TRADE PRACTICE OR COURSE OF PERFORMANCE.

## ARTICLE VIII – CUSTOMER INFORMATION AND DATA SECURITY

8.1.    ***Customer Information*** – Information and data relating to Customer or any Customer Affiliate and its customers, employees, consultants, representatives, and agents, including financial, statistical, personnel, technical data, marketing information, manufacturing data and processes, product information, and other information regarded as confidential or proprietary by Customer or any Customer Affiliate, that is contained in software programs accessed by AGS or is otherwise disclosed to AGS in connection with this Agreement ("**Customer Information**") is the property of Customer or such Customer Affiliate, and AGS will use such Customer Information solely for purposes of providing Services to Customer under this Agreement. Without limiting the generality of the foregoing, AGS acknowledges that information contained in the ATS regarding Customer's use of Candidates shall be treated as Customer Information under this Agreement. AGS shall not possess any interest, title, lien or right to any such Customer Information.

8.2.    ***Data Security.*** AGS shall make best efforts to ensure that the Customer Information is securely maintained. In addition, AGS will comply with any security provisions set forth in the applicable SOW. AGS will promptly notify Customer upon discovering or otherwise learning of a Security Incident. Nothing herein

Recruitment Process Outsourcing Agreement -
Proprietary and Confidential: V 01 02 2019

shall negate AGS' obligations to comply with applicable law, including but not limited to Data Protection Laws regarding Customer Information. The Parties agree to comply with their respective obligations set forth in Exhibit C (Data Protection Addendum) attached hereto and incorporated herein.

## ARTICLE IX – PROPRIETARY RIGHTS AND CONFIDENTIAL INFORMATION

9.1.  **AGS Technology –** AGS has created, acquired or otherwise has rights in, and may, in connection with the performance of Services hereunder, employ, provide, modify, create, acquire or otherwise obtain rights in, various concepts, ideas, methods, methodologies, procedures, processes, know-how, techniques, models, templates, the generalized features of the structure, sequence and organization of software, user interfaces and screen designs, general purpose consulting and software tools, utilities and routines, and logic, coherence and methods of operation of systems (collectively, the "**AGS Technology**"). AGS Technology shall be considered AGS Intellectual Property for purposes of this Agreement.

9.2.  **Confidential Information –** During the Term of this Agreement, each Party agrees that information that is non-public or proprietary may be disclosed by such Party (the "**Disclosing Party**") to the other Party (the "**Receiving Party**"), including, but not limited to, trade secrets, methodologies, AGS lists, data, including cost and price data, software, computer and telecommunications systems, records, technical processes and formulas, product designs, sales, unpublished financial information, product and business plans, usage rates, projections, marketing data and memoranda, papers, letters, e-mail, notes, plans, documentation, records, and all copies thereof relating to past, existing, or planned business or technology of the Disclosing Party or of the Disclosing Party's clients or customers (collectively, "**Confidential Information**"). Customer Information shall be the Confidential Information of Customer, AGS Technology shall be the Confidential Information of AGS, and the terms and conditions of this Agreement shall be the Confidential Information of both Parties. Confidential Information excludes information that the Receiving Party can demonstrate: (a) was publicly disclosed by the Disclosing Party either prior to or subsequent to the receipt by the Receiving Party of such information; (b) was known to the Receiving Party as of the time of its disclosure free from any obligation to keep such information confidential as demonstrated by its written records maintained in the ordinary course of business or actual prior use; (c) was independently developed by the Receiving Party without access to the Confidential Information of the Disclosing Party; (d) was rightfully obtained from a third party lawfully in possession of the Confidential Information and not under a confidentiality obligation to the Disclosing Party; or (e) is required by law to be disclosed by such Party; provided the Receiving Party, where reasonably practicable and to the extent legally permissible, provides the Disclosing Party with prior written notice of such required disclosure. The Receiving Party shall hold all the Disclosing Party's Confidential Information in trust and confidence for the Disclosing Party. Except as may be authorized by the Disclosing Party in writing, the Receiving Party shall not disclose to any person, firm, or enterprise, or use for its own benefit, any such Confidential Information, and even when so authorized by the Disclosing Party, the Receiving Party shall limit access and disclosure to the Receiving Party's personnel on a "need to know" basis only.

AGS shall ensure that each of its employees who obtains or is in a position to obtain any Customer Confidential Information is subject to appropriate non-disclosure obligations requiring such employees to maintain the confidentiality of such Customer Confidential Information.

9.3.  **Intellectual Property Rights –** Customer shall own any Deliverable that is (i) a derivative work of Customer materials or Customer Intellectual Property or (ii) first developed under this Agreement and not a derivative work of either Party's materials or Intellectual Property. AGS shall own any Deliverable that is a derivative work of AGS materials or AGS Intellectual Property, subject to the following: (i) for any such AGS-owned Deliverable that is software, AGS grants Customer a non-exclusive, non-transferable, non-

sublicensable (except to Customer Affiliates), royalty-free, limited license to use such software Deliverable on processors under the control of Customer or a Customer Affiliate solely for Customer's own internal business purposes and during the Term of this Agreement; and (ii) for any AGS-owned Deliverable that is not software, AGS grants Customer a non-exclusive, non-transferable non-sublicensable (except to Customer Affiliates), royalty free, limited license to use such Deliverable solely for Customer's and Customer Affiliates' own internal business use and during the Term of this Agreement. AGS remains the exclusive owner of AGS-owned Deliverables and the tools, underlying technologies, methodologies and processes, including AGS Technology, used by AGS in the delivery of the Services and shall exclusively own any ideas, concepts, and techniques AGS develops arising out of its performance under this Agreement (other than Deliverables as noted in 9.3(ii) above) and further independent of Customer Confidential Information and pre-existing Customer Intellectual Property. Neither Party will gain by virtue of this Agreement any rights of ownership in the Intellectual Property of the other Party. To the extent that any Customer-owned Deliverable incorporates AGS Intellectual Property, AGS hereby grants Customer a perpetual, non-exclusive, non-transferable, non-sublicensable (except to Customer Affiliates), royalty-free right to use such AGS Intellectual Property solely for Customer's and Customer Affiliates' own internal business use. Customer grants AGS a non-exclusive, non-transferable, royalty-free license to use, copy, make derivative works of, distribute, display, perform and transmit Customer Intellectual Property solely to the extent necessary for AGS to perform its obligations under this Agreement.

9.4.  **Aggregate Statistical Usage** – Customer acknowledges and agrees that AGS will collect data related to the performance of the Services for the purposes of aggregation and the creation of a centralized benchmarking mechanism. Notwithstanding anything to the contrary in this Agreement, Customer acknowledges and agrees that AGS shall have the perpetual right to use and disclose the data collected relating to the Services, in any manner, as long as any data collected is done on an aggregate basis, with Customer's data aggregated with data from other AGS customers, so as to be non-specific to Customer or including any personally identifiable information of an individual, and further provided that AGS' use of the data complies with applicable law.

9.5.  **Injunctive Relief** – Each party may seek injunctive relief from any breach of this Agreement. Nothing in this Agreement is intended to prohibit a Party from obtaining injunctive relief.

**ARTICLE X – INDEMNIFICATION**

10.1.  **Intellectual Property Infringement** -

(a)  **Indemnification**. AGS will defend or, at its sole option, settle, any third-party claim(s) brought against Customer and its Affiliates that AGS Intellectual Property provided hereunder infringes any United States Intellectual Property right of any third party, and indemnify Customer against all damages, fees, fines, awards, and costs (including, reasonable attorney's fees and costs of court) finally awarded against Customer under any such claim or action by a court of final jurisdiction or included as part of any settlement of such claim. AGS may, at its sole option and expense, either: (a) procure for Customer the right to continue using the infringing AGS Intellectual Property, (b) modify AGS Intellectual Property so that it is non-infringing, or (c) replace the infringing AGS Intellectual Property, as applicable with a materially and substantially equivalent non-infringing software, service or equipment.

(b)  **Exclusions**. The foregoing indemnity obligations will not apply to the extent the infringement arises as a result of (i) modifications to AGS Intellectual Property made by any party other than AGS or as authorized by AGS or AGS's authorized representative, (ii) the combination or use of AGS

Intellectual Property with materials, products, system, software or equipment not furnished by AGS or as authorized by AGS or AGS's authorized representative, or (iii) use of AGS Intellectual Property by Customer outside the scope of this Agreement.

(c) **Exclusive Remedy.** THE FOREGOING ARE AGS' SOLE AND EXCLUSIVE OBLIGATIONS, AND CUSTOMER'S SOLE AND EXCLUSIVE REMEDIES, WITH RESPECT TO INTELLECTUAL PROPERTY INFRINGEMENT.

10.2. **Indemnification by AGS –** AGS agrees, at its own expense, to indemnify, defend, and hold harmless Customer and its parent, subsidiaries, Affiliates, directors, officers, employees, and agents against any and all third-party losses, liabilities, judgments, awards, and costs (including reasonable attorneys' fees and expenses) to the extent arising out of or relating to:

(a) bodily injury (including death) or any real or tangible property loss or damage as a direct result of AGS's employees' negligent acts or omissions in the performance of Services; or

(b) any breach by AGS of Section 5.2 or Section 5.3.

10.3. **Indemnification by Customer –** Customer agrees, at its own expense, to indemnify, defend, and hold harmless AGS and its parent, subsidiaries, affiliates, directors, officers, employees, and agents against any and all third-party losses, liabilities, judgments, awards, and costs (including reasonable attorneys' fees and expenses) to the extent arising out of or relating to:

(a) bodily injury (including death) or any real or tangible property loss or damage as a direct result of Customer's employees' negligent acts or omissions;

(b) any breach by Customer of Section 3.4; or

(c) any Transaction Taxes levied, assessed or imposed by any taxing authority as a result of, or in connection with this Agreement, whatever the source and regardless of whether invoiced to or remitted by Customer.

10.4. **Indemnification Procedures –** The Party seeking indemnification under this Article X (the "**Indemnified Party**") shall notify the other Party (the "**Indemnifying Party**") promptly after the Indemnified Party receives notice of a claim for which indemnification is sought under this Agreement; provided, however, that no failure to so notify the Indemnifying Party shall relieve the Indemnifying Party of its obligations under this Agreement except to the extent that it can demonstrate damages directly attributable to such failure.  To the extent permitted by law, the Indemnifying Party shall have authority to defend or settle the claim; provided, however, that the Indemnified Party, at its sole discretion and expense, shall have the right to participate in the defense and/or settlement of the claim, and provided further, that the Indemnifying Party shall not settle any such claim imposing any liability or other obligation on the Indemnified Party without the Indemnified Party's prior written consent.

**ARTICLE XI – LIMITATION OF LIABILITY**

11.1. **Exclusion of Damages -** IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, PUNITIVE, EXEMPLARY, RELIANCE OR SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING DAMAGES FOR LOST PROFITS, LOSS OF USE,

**Page 10 of 34**

BUSINESS INTERRUPTION, OR LOSS OF DATA IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT REGARDLESS OF THE FORM OF ACTION WHETHER IN CONTRACT, WARRANTY, STRICT LIABILITY OR TORT UNDER THIS AGREEMENT AND EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

11.2.   **Cap on Damages –** EXCEPT FOR AS SET FORTH IN SECTION 11.3, IN NO EVENT WILL EITHER PARTY'S CUMULATIVE LIABILITY TO THE OTHER PARTY FOR DAMAGES UNDER THIS AGREEMENT OR OTHERWISE EXCEED THE SUM OF ALL FEES PAID OR PAYABLE TO AGS BY CUSTOMER UNDER THE APPLICABLE STATEMENT OF WORK FOR SERVICES RENDERED DURING THE TWELVE (12) MONTHS IMMEDIATELY PRECEDING THE MONTH IN WHICH SUCH LIABILITY AROSE. MULTIPLE CLAIMS WILL NOT ENLARGE THIS LIMIT. THIS LIMITATION OF LIABILITY SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY EXCLUSIVE REMEDY HEREIN.

11.3.   **Super Cap** - SUBJECT TO THE SUPER CAP, THE LIMITATION OF LIABILITY SET FORTH IN SECTION 11.2 SHALL NOT APPLY TO: (I) EITHER PARTY'S LIABILITY IN CONNECTION WITH ITS INDEMNITY OBLIGATIONS UNDER ARTICLE X (INDEMNIFICATION); AND (II) EITHER PARTY'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS UNDER SECTION 9.3 (CONFIDENTIAL INFORMATION). "**SUPER CAP**" MEANS IN THE AGGREGATE FOR EACH PARTY THE GREATER OF (I) FIVE MILLION DOLLARS ($5,000,000) OR (II) TWO (2) TIMES THE SUM OF ALL FEES PAID OR PAYABLE TO AGS BY CUSTOMER UNDER THE APPLICABLE STATEMENT OF WORK FOR SERVICES RENDERED DURING THE TWELVE (12) MONTHS IMMEDIATELY PRECEDING THE MONTH IN WHICH SUCH LIABILITY AROSE. MULTIPLE CLAIMS WILL NOT ENLARGE THIS LIMIT. THIS LIMITATION OF LIABILITY SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY EXCLUSIVE REMEDY HEREIN.

## ARTICLE XII – TERMINATION

12.1.   **Termination for Cause by Customer –** Customer shall have the right to terminate this Agreement if AGS materially breaches this Agreement and fails to cure such breach within thirty (30) days after receiving written notice from Customer specifying such breach.

12.2.   **Termination for Cause by AGS –** AGS shall have the right to terminate this Agreement if Customer materially breaches this Agreement and fails to cure such breach within thirty (30) days after receiving written notice from AGS specifying such breach.

12.3.   **Termination for Insolvency –** A Party will be deemed in breach of this Agreement, and the other Party shall have the right to terminate this Agreement immediately by notice to the other Party, if such Party becomes or is declared insolvent or bankrupt, is the subject of any proceedings relating to its liquidation or insolvency, or for the appointment of a receiver, conservator, or similar officer, is unable to pay its debts as they become due, makes an assignment to or for the benefit of its creditors, or ceases to conduct business for any reason on an ongoing basis leaving no successor in interest.

## ARTICLE XIII – GENERAL PROVISIONS

13.1.   **Security and Safety –** AGS shall obey, and shall be responsible for ensuring that AGS personnel providing the Services obey, whenever on Customer's premises, or remotely accessing Customer's computer or telecommunications networks, all applicable rules, regulations, and Customer policies, including safety and fire prevention rules, network and equipment use policies, and all reasonable

instructions and directions issued by Customer. AGS agrees to cooperate fully and shall provide any assistance necessary to Customer in investigation of any security breaches which may involve AGS personnel.

13.2.    **Waiver** – A waiver by either Party of any of the covenants, conditions, or agreements to be performed by the other Party or any breach thereof will not be construed to be a waiver of any succeeding breach or of any other covenant, condition, or agreement contained in this Agreement.

13.3.    **Non-solicitation** – Each Party agrees not to offer employment to, hire, engage the services of, or to use, directly or indirectly, the employees or consultants of the other, during the Term of this Agreement and for a period of one (1) year thereafter, without the prior written consent of the other Party.  Notwithstanding the foregoing, either Party may solicit or employ any person who (i) responds to a general solicitation of employment through an advertisement not specifically targeted at the other Party or its employees, (ii) is referred to the other Party by search firms, employment agencies, or other similar entities, provided that such entities have not been specifically instructed to solicit employees of the other Party, (iii) contacts the other Party on his or her own initiative without any direct or indirect solicitation, or (iv) has not been an employee of the other Party for at least sixty (60) days.

13.4.    **Notices** – Any notice provided pursuant to this Agreement shall be in writing and shall be deemed given: (a) if by hand delivery, upon receipt thereof; (b) if by next day express delivery service, upon such delivery; and (c) if by facsimile transmission, at the time such transmission is confirmed electronically; provided that such notice is promptly confirmed by one of the other methods listed in this Section.  All notice shall be addressed or sent as follows:

        If to Customer:

        Pomeroy IT Solutions Sales Company, Inc. d/b/a Getronics
        1020 Petersburg Road
        Hebron, KY 41048
        Attn: Dena King

        With a copy to:

        Pomeroy IT Solutions Sales Company, Inc. d/b/a Getronics
        1020 Petersburg Road
        Hebron, KY 41048
        Attn: Legal

        If to AGS:

        Allegis Global Solutions, Inc.
        7301 Parkway Drive
        Hanover, MD  21076
        Fax: 410-579-3136
        Attn: General Counsel

        With a copy to:

        Allegis Global Solutions, Inc.
        7312 Parkway Drive
        Hanover, MD  21076
        Fax: 410-579-6011

Attn: Director of Finance

Either Party may from time to time change its address for notification purposes by giving the other Party written notice of the new address and the date upon which such new address will become effective.

13.5.   **Binding Nature and Assignment** – This Agreement will bind and inure to the benefit of each Party's permitted successors and assigns. Neither Party will assign this Agreement without the prior written consent of the other Party, which consent shall not be unreasonably withheld; provided, however, either Party may, by notice to the other Party, assign this agreement to any Affiliate or any entity resulting from the sale, combination or transfer of all or substantially all of the assets or capital stock of, or from any other corporate form of reorganization by or of, such Party. AGS may subcontract any of its obligations under this Agreement, and may perform those obligations through personnel employed by or under contract with AGS, provided, however, that AGS (i) shall notify Customer in writing that it has subcontracted any of its obligations under this Agreement; and (ii) agrees to remain responsible and liable hereunder to Customer for all subcontracted obligations under the Agreement to the same extent as if AGS performed such services.

13.6.   **Construction** – The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same effect as the word "shall." Articles and Section headings are for convenience only and will not be considered a part of the terms and conditions of the Agreement.  If any provision of this Agreement is declared or found to be illegal, unenforceable or void, then both Parties will be relieved of all obligations under such provision, but only to the extent that such provision is illegal, unenforceable, or void.

13.7   **Force Majeure** - If and to the extent that either Party's performance of any of its obligations pursuant to this Agreement is delayed by revolution or other civil disorders, wars, acts of terrorists or enemies, fires, floods, acts of God, federal, state or municipal action, statute, ordinance or regulation, or any other cause beyond the reasonable control of such Party (each, a "**Force Majeure Event**"), and such non-performance could not have been prevented by reasonable precautions, then the non-performing Party shall be excused from any further performance of those obligations for so long as such Force Majeure Event continues and such Party continues to use its best efforts to recommence performance whenever and to whatever extent possible without delay, including through the use of temporary alternate sources, temporary work around plans, or other means.  The Party whose performance is delayed by a Force Majeure Event shall immediately notify the other Party by telephone or other expeditious means of the occurrence of the Force Majeure Event and describe in reasonable detail the nature of the Force Majeure Event and the expected duration of the delay.  If any delay by AGS to perform any of its obligations under this Agreement due to a Force Majeure Event continues for a period of ninety (90) days or more, Customer shall have the right to terminate this Agreement without additional liability or penalty owed to AGS beyond the fees and expenses already earned by AGS for services performed under this Agreement.

13.8.   **Insurance** – Throughout the Term of this Agreement, AGS agrees to maintain the insurance coverage described in Schedule A.

AGS agrees that each insurance policy shall: (i) be maintained with an insurance carrier with an A.M. Best Rating of at least A-·VII; (ii) name Customer as additional insured and additional loss payee, where applicable; and (iii) provide for at least thirty (30) days' prior notice to Customer in the event of any

modification or cancellation.  AGS shall also notify Customer at least thirty (30) days in advance if AGS desires to modify or cancel any such insurance.

Prior to commencing Services, AGS shall furnish Customer with certificates of insurance to evidence AGS' compliance with the insurance requirements of this Section 13.8.

13.9.   **Counterparts** – This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

13.10.   **Governing Law** – This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to its conflicts of law principals.  The sole and exclusive jurisdiction and venue for any litigation arising out of this Agreement shall be an appropriate federal or state court in New York County, New York and the Parties irrevocably consent to the personal jurisdiction of such courts; provided, however, that such jurisdiction election shall not prohibit a Party from seeking injunctive relief as provided herein in any other court of competent jurisdiction.

13.11.   **Survival** – Any provision of this Agreement which contemplates performance subsequent to any termination or expiration of this Agreement shall survive any termination or expiration of this Agreement and continue in full force and effect, including but not limited to, Section 3.8 (Compliance with Laws), Section 8.2 (Data Security), Article IX (Proprietary Rights and Confidential Information) and Article X (Indemnification).

13.12   **Third Party Beneficiaries** - Nothing in this Agreement, express or implied, is intended to confer on rights, benefits, remedies, obligations or liabilities on any person (including, without limitation, any employees or Affiliates of the Parties) other than the Parties or their respective successors or permitted assigns.

13.13.   **Entire Agreement** – This Agreement, which includes all Schedules, Statements of Work, Data Protection Agreements, and Country Participation Agreements, supersedes all prior oral or written communications concerning the subject matter of this Agreement between the Parties and constitutes the entire Agreement with respect thereto between the Parties, except as same may be amended in writing from time to time by the Parties. In the event of any conflict or inconsistency between this Agreement and the terms and conditions of any SOW, the terms and conditions of this Agreement shall prevail unless a conflicting term in an SOW is specifically identified as superseding the related term of this Agreement, in which case the conflicting term in the SOW shall govern.

13.14.   **Cumulative Remedies** – Except as specifically provided herein, no remedy made available to either Party hereunder is intended to be exclusive of any other remedy, and each and every remedy shall be cumulative and shall be in addition to every other remedy provided hereunder or available at law or in equity.

13.15.   **Modifications** – No modification, amendment, supplement to, or waiver of this Agreement or any of its provisions shall be binding upon the Parties hereto unless made in writing and duly signed by both Parties.

Recruitment Process Outsourcing Agreement -
Proprietary and Confidential: V 01 02 2019

IN WITNESS WHEREOF, AGS and Customer each have caused this Agreement to be signed and delivered by its duly authorized representative.

**Allegis Global Solutions, Inc.**

_Ein Xur_
_____
Signature

Name: <Insert Name> ERIC KNORR

Title: <Insert Title> DIRECTOR, FINANCE

Date: <Insert Date> August 9, 2019

**Pomeroy IT Solutions Sales Company, Inc.,**
**d/b/a Getronics**

_____
Signature

Name: **Michael O'Toole**

Title: **Associate General Counsel/Head of Legal US**

Date: **August 9, 2019**

**TABLE OF SCHEDULES AND EXHIBITS**

| SCHEDULE OR EXHIBIT | DESCRIPTION |
|---|---|
| Schedule A | Insurance |
| Schedule B | Country Participation Agreement |
| Schedule C | Data Protection Addendum |

Recruitment Process Outsourcing Agreement -
Proprietary and Confidential: V 01 02 2019

**SCHEDULE A**

**INSURANCE**

AGS shall obtain and maintain pursuant to the terms of this Agreement, at its sole expense, the following types of insurance coverage, with minimum limits as set forth below:

| Type of Insurance | Minimum Coverage Amount |
|---|---|
| **Commercial Automobile Liability** Combined single limit on any vehicles used by any Contractor in the course of providing Services hereunder. | **$ 1,000,000** |
| **Commercial General Liability** Combined single limit coverage to include blanket contractual liability, broad form damage and personal liability. | **$ 1,000,000** |
| **Employers' Liability** Each employee for bodily injury by accident and disease. | **$ 500,000** |
| **Workers' Compensation** All states of operation. | **Statutory Limits** |
| **Excess Liability Coverage** | **$ 4,000,000** |

Recruitment Process Outsourcing Agreement - Proprietary and Confidential: V 01 02 2019

<u>SCHEDULE B</u>

<u>Country Participation Agreement</u>

# RPO COUNTRY PARTICIPATION AGREEMENT

**THIS COUNTRY PARTICIPATION AGREEMENT** is entered into on ...............2019  (the "**CPA**")

**BETWEEN**

**(1)** [*insert name of end user local entity*] a company registered in [XXX] with company number [XXX] whose registered office is at [XXX] (the "**Local Customer**"); and

**(2)** [*insert name of AGS entity in that country*] a company registered in [XXX] with company number [XXX] whose registered office is at [XXX] (the "**Local AGS**");

(the "**Parties**" and each a "**Party**").

**WHEREAS:**

I. [XXXX] ("**Customer**") and [XXXX] ("**AGS**") have entered into a master services agreement for the provision of certain services, dated  [XXXX] (the "**MSA**").

II. The MSA sets out the Customer and AGS' general duties and obligations towards each other [in the [USA *or insert relevant country*] and on the understanding that further country participation agreements will be entered into when these parties wish to receive or provide (as relevant) certain services in another country.

III. The Customer and AGS have now decided that they wish to receive or provide (as relevant) certain services in the Country (as defined below) as relevant.

IV. The Customer and AGS acting through the Local Customer and Local AGS agree to enter into this CPA which incorporates the terms of the MSA except as amended or supplemented below.

**IT IS AGREED THAT:**

1. **Scope and Use of Terms**

1.1 This CPA incorporates the terms of the MSA unless expressly stated to the contrary and/or to the extent amended or supplemented by this CPA.

1.2 To the extent Services are received or provided pursuant to this CPA all references in the MSA to:

1.2.1 AGS shall, for the purposes of this CPA, be interpreted as references to Local AGS (unless otherwise set out below); and

1.2.2 Customer shall, for the purposes of this CPA, be interpreted as references to the Local Customer (unless otherwise set out below).

1.3 To the extent Services are received or provided in the Country the provisions of this CPA take precedence over the MSA. For the avoidance of doubt if there is any inconsistency between the terms of the CPA and the MSA (including the MSA's schedules, attachments, annexes or similar) or any AGS manual the terms of this CPA shall prevail in respect of the Country.

1.4 [For the avoidance of doubt this CPA represents a valid and binding country agreement within the meaning of Clause 2.13 of the MSA].

1.5 For the avoidance of doubt all claims and liabilities arising in connection with the Services shall be dealt with subject to the terms of the MSA.

1.6 Capitalised terms in this CPA shall have the same meanings as defined within the MSA unless expressly defined herein and the following terms shall have the following meanings:

"**Applicable Law**" means laws and/or any other instruments having the force of law in the Country.

"**Country**" means [England].

"**Country Go Live Date**" has the meaning set out at Clause [6.1].

"**Employee Liability Information**" means the information specified in Regulation 11(2) of TUPE.

"**Fair Dismissal**" means the dismissal of an employee that is reasonably considered to be carried out fairly within the meaning of [s98 Employment Rights Act 1996] and in accordance with that employee's contract of employment.

"**Incumbent Service Provider**" means any entity or person (including but not limited to Local

"**Losses**" means any losses, liabilities, damages, compensation awards, payments made under any settlement arrangements, damages, claims, costs and expenses including fines, penalties, legal and other professional fees.

"**New Agency**" means any person (including Local Customer) who, upon a Service Provision Change, provides any or all of the Transferred Services which immediately prior to the Service Provision Change were provided by Local AGS or one of its Affiliates pursuant to this CPA.

"**Pay**" means "pay" as defined under Regulation 6(2) of the AWR.
**Service(s)**" means the services as described in the [MSA] [and as amended or supplemented by [Clause 2]].

"**Service Provision Change**" means the date of any transfer of all or part of the Transferred Services pursuant to TUPE.

"**Agency AGS(s)**" shall have the same meaning in the MSA [notwithstanding that Agency AGS Agreement shall mean the agreement between Local Customer and Agency AGS].

"**Transferred Affected Employee**" means the employees of Local AGS or one of its Affiliates that are wholly or mainly engaged in the provision of the Transferred Services immediately before the Service Provision Change.

**"Transferred Employee"** means any employees employed by Incumbent Service Provider and engaged wholly or mainly in the provision of the Transferred Services immediately before the Country Go Live Date who are identified to [Local AGS in [Schedule 1] **or** [in writing on or before 60 days preceding the Country Go Live Date]].

**"Transferred Services"** means management services in connection with Local Customer's use of AGSs of temporary contract resource.

"**TUPE**" or "**TUPE Regulations**" means the Transfer of Undertakings (Protection of Employment) Regulations 2006 (SI 2006/246).

1.7 Clause, Schedule and paragraph headings shall not affect the interpretation of this CPA.

1.8 Unless the context otherwise requires, words in the singular shall include the plural and vice versa, and a reference to one gender shall include a reference to the other genders.  A person includes a natural person, corporate or unincorporated body (whether or not having separate legal personality).

1.9 The Schedules form part of this CPA and any reference to this CPA includes the Schedules.

1.10      A reference to a party includes its personal representatives, successors or permitted assigns.

1.11      A reference to a statute or statutory provision is a reference to it as amended, extended or re-enacted from time to time and any reference to a statute or statutory provision shall include all subordinate legislation made from time to time under that statute or statutory provision.

1.12      A reference to writing or written includes fax and email.

1.13      Any words following the terms including, include, in particular, for example or any similar expression shall be construed as illustrative and shall not limit the sense of the words, description, definition, phrase or term preceding those terms.

2. <u>SERVICES</u>

**Summary of Services**

2.1 **Option 1:** [As set out in the MSA] this CPA is entered into to address specific in-Country requirements of the Parties and/or to address any mandatory legal requirements in the Country. For the avoidance of doubt there are no local service variations for this CPA.]

**Or….Option 2:**
[As set out in the MSA] this CPA is entered into to address specific in-Country requirements of the Parties and/or to address any mandatory legal requirements in the Country. These local service variations are set out in this Clause 2.

2.2 In the Country Local AGS agrees to provide:

Recruitment Process Outsourcing Agreement -
Proprietary and Confidential: V 01 02 2019

2.2.1    [*inset additional or amended services to the extent client wants something different in the UK or Local AGS is providing a different service within the UK*]; and

2.2.2    [*inset additional or amended services to the extent client wants something different in the UK or Local AGS is providing a different service within the UK*].]

2.3 [Due to in-Country requirements and for the avoidance of doubt Local AGS will not provide the following services covered in the [MSA/US SOW/US Service Description]]:

2.3.1    [*reference clause of MSA/Service Description which will not apply*]; and

2.3.2    [*reference clause of MSA/Service Description which will not apply*];]]

3.    **[SERVICE LEVELS]**

3.1 [Identify or *set out different service levels or KPI's to those in the MSA (or any SOW/related schedule or service description)*]

4.    **CAPACITY**

4.1 **[Use if not holding Agency AGS contracts]** Local AGS shall provide Agency AGS management services as Local Customer's agent and not a contractual intermediary. Local Customer (rather than Local AGS) shall contract with the Agency AGSs who may source Candidates and the Parties agree that Local AGS shall not have any responsibility or assume any liability in respect of Local Customer's subcontractors (including Agency AGSs or any pre-employment screening providers or technology tools). [If applicable, Local Customer agrees to waive any obligation on Local AGS to ensure particular provisions are included in Agency AGS Agreements.]

4.2 Local Customer shall provide any information reasonably required by Local AGS or to enable it or any Agency AGS(s) on the RPO program to discharge any duties they may have under the Conduct of Employment Agencies and Employment Businesses Regulations 2003 or Applicable Law.

5.    **LOCATION AND TIME ZONE**

5.1 Local AGS will provide the Services from its offices in [England][ and Local Customer's offices in [*insert address*]].

5.2 Any reference in the MSA or any service related agreement to [Eastern time/insert any other time zone referred to] shall be amended to [London time].

6.    **TERM**

6.1 [This CPA shall come into force on [*specify go live date*] (the "**Country Go Live Date**")] *OR* [This CPA shall come into force on the date this CPA is signed (the "**Country Go Live Date**")] and,

subject to earlier termination of the MSA or this CPA pursuant to [Clause 7], shall continue for [the term of the MSA]**or** [[X] years].

7. **TERMINATION**

7.1 [This CPA shall terminate in accordance with the provisions of the MSA.]

7.2 [In addition to any termination rights set out in the MSA [Local AGS/Local Customer] may terminate this CPA if [XXX]].

7.3 [For the purposes of this CPA [Local Customer/Local AGS] will not be able to terminate this CPA in accordance with Clause [XX] of the MSA.]

7.4 [If this CPA is terminated [at any time/within [x] months of the Country Go Live Date] then Local Customer shall pay Local AGS a termination fee of [£xxxx]].

8. **AMENDMENT TO CHARGES/INVOICING SPECIFIED IN [XXX] OF [MSA]**

8.1 [(if applicable) insert Country specific minimum monthly spend or requisition volume].

8.2 [(if applicable) set out any adjustments to any pricing in the MSA].

8.3 For the avoidance of doubt all sums due in connection with this CPA shall be paid in [       ] and unless, otherwise stated, be exclusive of any Value Added Tax which may be charged.

9. **DATA PROTECTION**

The provisions of the data protection agreement between [AGS Entity] and [Customer Enity] are incorporated into this Agreement

10. **TUPE**
**Transfer of Service to Local AGS**

10.1 It is acknowledged by the Parties that the TUPE Regulations [may] apply to the transfer of the Transferred Services and [if this occurs, then] the contracts of employment made between the Incumbent Service Provider and the Transferred Employees will have effect upon such transfer as if originally made between Local AGS and each of the Transferred Employees (except to the extent such contracts relate to old age, invalidity and survivor's benefits under any occupational pension scheme).

10.2 Local Customer undertakes to indemnify Local AGS against any and all Losses which Local AGS or any AGS Affiliate(s) may incur arising out of or in connection with:

10.2.1 any claim or demand relating to any acts or omissions of Incumbent Service Provider prior to the commencement of services including the employment and/or dismissal of any person or persons (including a Transferred Employee) by Incumbent Service Provider;

Recruitment Process Outsourcing Agreement -
Proprietary and Confidential: V 01 02 2019

10.2.2   the employment of any person (other than a Transferred Employee) whose employment transfers or is alleged to transfer to Local AGS or any AGS Affiliate(s) by virtue of TUPE Regulations;

10.2.3   any failure on the part of Incumbent Service Provider to comply with Regulations 11 and/or 13 and/or 14 of the TUPE Regulations;

10.2.4   any fines or penalties incurred by Local AGS or any AGS Affiliate(s) as a consequence of employing any Transferred Employee who did not have permission to work or leave to remain in the United Kingdom during his/her employment by Incumbent Service Provider;

10.2.5   any costs incurred for acquiring for any such Transferred Employee such permission to work or leave to remain as is necessary to permit the Transferred Employee's continued employment by Local AGS or any AGS Affiliate(s); and

10.2.6   any costs and/or claims arising from any decision by the UK Border Agency to curtail any such Transferred  Employee's leave to remain in the United Kingdom, including but not limited to any costs and/or claims arising from the termination of such Transferred Employee's employment by Local AGS or any AGS Affiliate(s) as a consequence.

10.3   Where any person (other than a Transferred Employee) claims or alleges that his or her employment should transfer or has transferred to Local AGS or any AGS Affiliate(s) as a consequence of the TUPE Regulations and he/she is not a Transferred Employee:

10.3.1   Local AGS will notify Local Customer and any other Incumbent Service Provider in writing of the name of any such person and his/her claim or allegation within 10 working days of Local AGS receiving notice of any such claim or allegation;

10.3.2   thereafter, Incumbent Service Provider will have thirty (30) working days within which to re-employ or re-engage the person or reach a settlement by way of a compromise agreement with him or her for the benefit of Incumbent Service Provider and Local AGS (and any AGS Affiliate(s)); and

10.3.3   following the expiry of the period referred to in Clause [10.3.2] above, Local AGS may terminate the employment of any such person in reliance on the indemnity in Clause [10.2] above always provided that Local AGS shall use its reasonable endeavours to ensure that any dismissal is a Fair Dismissal.

**Obligations during the provision of the Transferred Services**

10.4   Local Customer will and/or will procure that any other Incumbent Service Provider shall forward to Local AGS any notices, correspondence, information or enquiries which relate to the Transferred Employees within 5 working days of receipt or, where an earlier response is required, forthwith.

10.5   Local AGS shall indemnify Local Customer against any Losses which Local Customer may reasonably incur arising out of or in connection with any claim or demand relating to the employment and/or dismissal of any Transferred Employee by Local AGS which occurred on or after the Go-Live Date (but before the termination date of this CPA).

Recruitment Process Outsourcing Agreement -
Proprietary and Confidential: V 01 02 2019

**Transfer of the Transferred Services to a New Agency**

10.6    The Parties acknowledge and agree that the TUPE Regulations [may] apply to the transfer of the Transferred Services from Local AGS (or any AGS Affiliate(s)) to a New Agency on any Service Provision Change and that, where this is so, the contracts of employment made between Local AGS (or an AGS Affiliate) and the Transferred Affected Employee will have effect from the Service Provision Change as if originally made between the New Agency and each of the Transferred Affected Employees.

10.7    In the event of a Service Provision Change Local Customer undertakes to indemnify Local AGS against all Losses which Local AGS or any AGS Affiliate(s) may incur arising out of or in connection with:

10.7.1    any claim or demand relating to the employment and/or dismissal of any Transferred Affected Employee by the New Agency from the date of the Service Provision Change;

10.7.2    the New Agency's failure to discharge its duties and/or obligations under Regulation 13(4) of the TUPE Regulations;

10.7.3    any claim or demand made by or on behalf of any Transferred Affected Employee pursuant to and/or falling within Regulations 4(9) of the TUPE Regulations, save where:

10.7.3.1    such a change is in relation to a working condition that has not been disclosed to the New Agency; or

10.7.3.2    such a claim arises from the manner in which the change was communicated to the Transferred Affected Employee or any person on behalf of the Transferred Affected Employee by the Agency;

10.7.4    any claim or demand made by or on behalf of any Transferred Affected Employee pursuant to and/or falling within Regulations 4(11) of TUPE.

11.    **MISCELLANEOUS**

11.1    *Waiver*: a waiver under this CPA is only effective if it is in writing and shall not be deemed to be a waiver of any subsequent breach or default under this CPA and/or the MSA.  No failure or delay by a Party to exercise any right or remedy provided under this CPA or by law shall constitute a waiver of that or any other right or remedy, nor shall it prevent or restrict the further exercise of that or any other right or remedy.  No single or partial exercise of such right or remedy shall prevent or restrict the further exercise of that or any other right or remedy.

11.2    *Rights and Remedies*: except as otherwise expressly provided in this CPA, all rights contained in this CPA and all remedies available to either Party for breach of this CPA are cumulative and may be exercised concurrently or separately and the exercise of any one right or remedy shall not be deemed an election of such right or remedy to the exclusion of other rights or remedies.

11.3    *Survival:* any provision of this CPA that expressly or by implication is intended to come into or continue in force on or after termination or expiry of this CPA including (but not limited to), [insert

clauses, e.g. Intellectual Property Rights, Data Protection, Confidentiality, Anti-Bribery, and Indemnity and Limitation of Liability etc.] shall survive any termination or expiration of this CPA and continue in full force and effect.

11.4   **Severability:** if a court or any other competent authority finds that any provision of this CPA (or part of any provision) is invalid, illegal or unenforceable, that provision or part-provision shall, to the extent required, be deemed deleted, and the validity and enforceability of the other provisions of this CPA shall not be affected.  If any invalid, unenforceable or illegal provision of this CPA would be valid, enforceable and legal if some part of it were deleted, the provision shall apply with the minimum modification necessary to make it legal, valid and enforceable.

11.5   **Counterparts**: this CPA may be executed in several counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument. No counterpart shall be effective until each Party has executed at least one counterpart. Transmission of an executed counterpart of this CPA (but, for the avoidance of doubt, not just a signature page) by (a) fax or (b) email (in PDF, JPEG or other agreed format) shall take effect as delivery of an executed counterpart of this CPA. If either method of delivery is adopted, without prejudice to the validity of this CPA, each Party shall provide the others with the original of such counterpart as soon as reasonably possible thereafter.

11.6   **Governing Law**: this CPA and any dispute or claim arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims), shall be governed by, and construed in accordance with, English law, and the parties irrevocably submit to the exclusive jurisdiction of the courts of England and Wales.

11.7   **No Interference with Contractual Relationship:** each Party warrants to the other Party that it is not subject to any contractual obligation that would prevent it from entering into this CPA, and that Local AGS' offer to provide the Services to Local Customer and Local Customer's acceptance of such offer in no way caused or induced either party to breach any contractual obligation.

11.8   **No Partnership or Agency:** nothing contained in this CPA shall be construed to make either Local Customer, Local AGS or any Affiliate, partners, joint ventures, principals, agents, or employees of the other, except to the extent an agency relationship is specified in this CPA and/or the MSA; provided, however, that the foregoing shall not be construed as preventing the Local AGS from performing any of its obligations under this CPA.  Neither Party shall have any right, power, or authority, to bind the other except as expressly specified in this CPA.

11.9   **Entire Agreement** – This CPA and the MSA (to the extent incorporated or amended and supplemented by this CPA) constitute the entire agreement between the Parties and supersedes and extinguishes all previous agreements, promises, assurances, warranties, representations and understandings between them, whether written or oral, or expressed or implied relating to its subject matter.  Each Party acknowledges that by entering into this CPA it does not rely on, and shall have no remedies in respect of, any statement, representation, assurance or warranty (whether made innocently or negligently) other than as expressly set out in this CPA including any provision of the MSA incorporated by reference herein.  Each Party agrees that it shall have no claim for innocent or negligent misrepresentation or negligent misstatement based on any statement in this CPA or any provision of the MSA incorporated by reference herein.

11.10 ***Fraud and fraudulent misrepresentation:*** nothing in this CPA shall restrict or exclude any liability for (or remedy in respect of) fraud or fraudulent misrepresentation.

11.11 ***Binding Nature and Assignment:*** Neither Party will assign, subcontract, or otherwise transfer or delegate its respective rights or duties under this CPA to any third party except as expressly permitted herein without the prior written consent of the other Party, and any purported assignment, subcontract, delegation or transfer without written consent of the other Party will be void.

11.12 ***Modifications*** – no variation of this CPA shall be effective unless it is in writing and duly signed by the Parties (or their personal representatives).

11.13 ***Third Party Rights***: [Except as expressly provided in this Clause 11.13], a person who is not a party to this CPA shall not have any rights under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this CPA.  [[Customer and AGS] shall have the same rights as Local Customer and Local AGS under this CPA by virtue of the Contracts (Rights of Third Parties) Act 1999.]

11.14 ***Notices***: any notice or other communication given to a Party under or in connection with this CPA shall be in writing and shall be delivered to the addressee personally, or sent by prepaid first class post, recorded delivery, or by commercial courier at its registered office (if a company) or (in any other case) its principal place of business, or by electronic mail.  Any notice or other communication shall be deemed to have been duly received (i) if delivered personally, when left at the address referred to above; (ii) if sent by prepaid first-class post or recorded delivery, at 9.00 am on the second business day after posting; or (iii) if delivered by commercial courier, on the date and at the time that the courier's delivery receipt is signed; or (iv) if by electronic mail, on the date of transmission.  All notices shall be sent to the following:

**If to Local Customer:**
<Insert Local Customer Name Here>
<Insert Address Here>
<Insert Address Here>
Email: <Insert email address Here>
Attn: <Insert Contact Name Here>

**If to Local AGS:**
Allegis Global Solutions Limited
Maxis 2, Western Road, Bracknell,
Attn: Legal Department

Either Party may from time to time change its address for notification purposes by giving the other written notice of the new address and the date upon which it will become effective.

Recruitment Process Outsourcing Agreement -
Proprietary and Confidential: V 01 02 2019

**SCHEDULE C**

**DATA PROTECTION ADDENDUM**
**The Parties agree as follows:**
**RECITALS**

A.        AGS and Customer have entered into a Master Services Agreement, together with one or more connected statements of work, purchase orders, contracts and/or agreements (collectively the "**Contract**"), pursuant to which AGS has agreed to provide certain outsourced recruitment services to the Customer, as described in the Contract (the "**Services**").

B.        The Parties wish to define their respective data protection obligations relating to the AGS's provision of Services to Customer.

**1.        DEFINITIONS**

1.1        "**Affiliate**" means any entity that is directly or indirectly controlled by, controlling or under common control with a Party.  "**Control**" for purposes of this definition, means direct or indirect ownership or control of more than 50% of the voting interests of the subject entity.

1.2        "**Applicable Privacy Law(s)**" means all worldwide data protection and privacy laws and regulations applicable to the personal data in question, including, where applicable, EU Data Protection Law.

1.3        "**Authorized Affiliate**" means any of Customer Affiliate(s) permitted to or otherwise receiving the benefit of the Services pursuant to the Contract.

1.4        "**Authorized Persons**" means any person who processes personal data under this DPA on a Party's behalf, including that Party's employees, officers, directors, partners, principals, agents, representatives, contractors and in the case of the AGS, its Sub-processors.

1.5        "**Candidate**" means an individual candidate submitted to Customer to evaluate for potential hire by Customer for its internal employment needs.

1.6        "**Controller**" means the entity which determines the purposes and means of the processing of personal data.

1.7        "**Customer Data**" means all personal data that AGS and/or its Affiliates processes as a Processor on behalf of Customer in the course of providing the Services under the Contract, including (but not limited to) any personal data of Candidates but excluding AGS Candidate Data.

1.8        "**C2C Model Clauses**" means the Standard Contractual Clauses for controllers as approved by the European Commission and available at http://ec.europa.eu/justice/data-protection/international-transfers/files/clauses_for_personal_data_transfer_set_ii_c2004-5721.doc (as amended, superseded or updated from time to time).

1.9        "**C2P Model Clauses**" means the Standard Contractual Clauses for processors as approved by the European Commission and available at https://ec.europa.eu/info/law/law-topic/data-protection/data-transfers-outside-eu/model-contracts-transfer-personal-data-third-countries_en (as amended, superseded or updated from time to time).

1.10        "**Data Subject**" means the identified or identifiable person to whom personal data relates.

1.11        "**EEA Data Protection Law**" means (i) prior to 25 May 2018, Directive 95/46/EC of the European Parliament and of the Council on the protection of individuals with regard to the processing of personal data and on the free movement of such data (the "Directive"); and  on and after 25 May 2018, Regulation 2016/679 of the European Parliament and of the Council on the protection of

Page **27** of **34**

natural persons with regard to the processing of personal data and on the free movement of such data (General Data Protection Regulation) ("GDPR"); (ii) the e-Privacy Directive (Directive 2002/58/EC); and (iii) any national data protection laws made under or pursuant to (i) or (ii) (in each case, as superseded, amended or replaced).

1.12 "**personal data**" and "**processing**" (and "**process**") shall have the meanings given in Applicable Privacy Law.

1.13 "**Privacy Shield**" means the EU-US and Swiss-US Privacy Shield Frameworks, as administered by the U.S. Department of Commerce.

1.14 "**Privacy Shield Principles**" means the Privacy Shield Framework Principles (as supplemented by the Supplemental Principles) contained in Annex II to the European Commission Decision of 12 July 2016 pursuant to the Directive, details of which can be found at www.privacyshield.gov/eu-us-framework.

1.15 "**Processor**" means the entity which processes personal data on behalf of the Controller.

1.16 "**Security Incident**" means any unauthorized or unlawful breach of security that leads to the accidental or unlawful destruction, loss, alteration, unauthorized disclosure of or access to (i) in the case of the AGS, Customer Data processed by AGS and/or its Affiliates and Sub-processor(s); and (ii) in the case of the Customer, AGS Candidate Data processed by Customer.

1.17 "**Sub-processor**" means any Processor engaged by AGS and/or its Affiliates to assist in fulfilling its obligations with respect to providing the Services that processes Customer Data.

1.18 "**AGS Candidate Data**" means all personal data relating to Candidates that AGS (and/or its Affiliates) would otherwise collect, source and process independently of the Customer's use of the Services pursuant to the Contract.

## 2. RELATIONSHIP OF PARTIES AND ROLES

2.1 **Roles of the Parties and Details of Processing**. AGS shall (a) process Customer Data under the Contract as a Processor acting on behalf of Customer (the Controller); and (b) process AGS Candidate Data and Business Contact Data as an independent Controller. In no event will the Parties process personal data under this DPA as joint Controllers. Each Party will separately comply with its obligations under Applicable Privacy Law when processing personal data as a Controller. AGS shall at all times process the Customer Data only for the purposes described in **Annex A** ("**Permitted Purposes**") and in accordance with Customer's lawful documented instructions. The Parties agree that this DPA and the Contract set out the Customer's complete and final instructions to AGS in relation to the processing of Customer Data and processing outside the scope of these instructions (if any) shall require prior written agreement between Customer and AGS.

2.2 **Customer Processing of AGS Candidate Data**. AGS may provide or make available to Customer certain AGS Candidate Data as part of the Services, as more particularly described in **Annex D**. Customer shall process AGS Candidate Data as an independent Controller and solely for its own internal business purposes in accordance with and as permitted by the Contract (including this DPA) ("**Authorized Purposes** "), except where otherwise required under applicable law. Customer shall not process AGS Candidate Data in any way that causes (or is likely to cause) AGS to breach any of its obligations under Applicable Privacy Laws. Customer shall not disclose AGS Candidate Data to any third party without AGS's prior written consent, except: (i) where necessary for the Authorized Purposes; (ii) permitted or required pursuant to the Contract; or (iii) where otherwise required by applicable law. AGS warrants that it is a Controller under Applicable Privacy Laws and

that it is lawfully entitled to process, and has provided all required notices and obtained all necessary consents from the relevant data subjects to process the AGS Candidate Data in accordance with the Contract (including this DPA).

2.3 **AGS's Notification Obligations Regarding Customer Instructions.** AGS shall promptly notify Customer in writing, unless prohibited from doing so under Applicable Privacy Law, if:

(a) It becomes aware or believes that any data processing instruction from Customer violates Applicable Privacy Law;

(b) It is unable to comply with Customer's data processing instructions; and/or

(c) It is unable to comply with the terms of the Contract (including this DPA) as they relate to or govern the processing of Customer Data and/or the security of Customer Data for any reason.

2.4 **Business Contact Data.** AGS shall also process certain personal data (i.e. names, contact details and correspondence) of Customer's employees and representatives in connection with its performance of the Services, including for example for: (i) correspondence between AGS and Customer; (ii) invoicing, billing and other business inquiries related to the Contract, (iii) information on AGS's performance of the Services; and (vi) general contract management ("**Business Contact Data**"). AGS agrees to use the Business Contact Data only for the purposes outlined in this Section 2.4.

## 3.   SUBPROCESSING

3.1 **Appointment of Sub-processors.** AGS shall not subcontract any processing of the Customer Data to a Sub-processor without the prior written consent of Customer. Notwithstanding this, Customer consents to AGS engaging Sub-processors to process the Customer Data provided that:

(a) **Notification of New Sub-processors.** AGS provides at least 15 days prior written notice to Customer of any change in its Sub-processors (including details of the processing, location and any other information reasonably required by Customer) and AGS shall update the list of all Sub-processors engaged to process Customer Data under this DPA at **Annex C** and send such updated version to Customer prior to the change of Sub-processor. For the avoidance of doubt, the Sub-processors listed in Annex C on signing of this DPA shall be deemed approved by Customer upon signing;

(b) **Objection Right for New Sub-processors.** Customer may object to the appointment or replacement of a Sub-processor within 5 days after Customer first receives prior notice of such change provided such objection is based on reasonable grounds relating to data protection (e.g. if making Customer Data available to the Sub-processor may violate Applicable Privacy Law or weaken the protections for such Customer Data). In such event, the Parties shall discuss in good faith commercially reasonably alternative solutions. If the Parties cannot reach resolution within a reasonable period of time, which shall not exceed ten (10) days, AGS will either not appoint or replace the Sub-processor or, if this is not possible, either Party may terminate the Contract with respect to those Services that cannot be provided without the use of the objected-to-new Sub-processor, by providing written notice to the other Party. Customer shall receive a refund of any prepaid fees for the period following the effective date of termination in respect of the terminated Contract;

(c) **Data Protection Terms for Sub-processors.** AGS imposes data protection terms on any Sub-processor it engages that require it to protect Customer Data to the standard required by Applicable Privacy Law; and

(d)     **Liability.** AGS remains liable for the acts or omissions of its Sub-processors to the same extent AGS would be liable if performing the services of each Sub-processor directly under the terms of this DPA.

**4.     RIGHTS OF DATA SUBJECTS AND COOPERATION**

4.1     **Data Subject Request.** Each Party shall at the other Party's expense, taking into account the nature of the processing, reasonably cooperate with the other Party (or its third party Controller) (including, in so far as is possible, by appropriate technical and organisational measures) to enable the other Party to respond to any requests, complaints or other communications from Data Subjects and/or regulatory or judicial bodies relating to the processing of personal data by the other Party under or in connection with this DPA, including requests from Data Subjects seeking to exercise their rights under Applicable Privacy Laws. In the event that any such request, complaint or communication relates to Customer Data and is made directly to AGS, AGS shall promptly notify the Customer of the request and shall not respond to such communication without Customer's express authorization.

4.2     **Subpoenas and Court Orders.** If AGS receives a subpoena, court order, warrant or other legal demand from a third party (including law enforcement or other public or judicial authorities) seeking the disclosure of Customer Data, AGS shall unless prevented by applicable law, promptly notify Customer in writing of such request, and reasonably cooperate with Customer (at Customer's expense) if it wishes to limit, challenge or protect against such disclosure, to the extent permitted by applicable laws.

4.3     **Data Privacy Impact Assessments ("DPIA's").** To the extent AGS is required under Applicable Privacy Laws, AGS will provide reasonable assistance to Customer to enable the Customer to conduct a data protection impact assessment and, where legally required, consult with applicable data protection authorities in respect of any proposed processing activity conducted in connection with the Services that presents a high risk to the Customer Data.

**5.     DATA ACCESS & SECURITY MEASURES**

5.1     **Confidentiality and Limitation of Access.** AGS shall ensure that any AGS Authorized Person who processes Customer Data is subject to a strict duty of confidentiality (whether a contractual or statutory duty) and that they process the Customer Data only for the Permitted Purposes. AGS shall ensure that AGS's access to Customer Data is limited to those AGS Authorized Persons performing Services in accordance with this DPA. Customer shall ensure that any Customer Authorized Person is subject to a strict duty of confidentiality (whether a contractual or statutory duty) and that they process the AGS Candidate Data only for the Authorized Purposes.

5.2     **Security Measures.** Each Party will implement and maintain all appropriate technical and organizational measures to protect any personal data it receives from the other Party from Security Incidents and to preserve the security and confidentiality of such personal data. The security measures that AGS shall implement are described in **Annex B** ("**Security Measures**").

5.3     **Updates to Security Measures.** Customer acknowledges that the Security Measures are subject to technical progress and development and that AGS may update or modify the Security Measures from time to time provided that such updates and modifications do not result in the degradation of the overall security of the Customer Data processed in connection with the Services.

5.4     **Customer Responsibilities and Acknowledgements.** Notwithstanding the above, Customer agrees that except as provided by this DPA, Customer and not AGS shall be solely responsible for ensuring Customer Data accessed, maintained or stored while on the Customer's facilities and/or otherwise accessed or processed by AGS on computer systems or other electronic equipment controlled by Customer during the provision of Services is processed in compliance with

Customer's data protection and security obligations under Applicable Privacy Law and any associated policies, codes of practices and/or procedures relating to any employee, worker, customer, client, AGS or agent of the Customer (collectively the **"Customer Privacy Requirements"**).

**6.**    **SECURITY INCIDENTS**

6.1    **Notification of Security Incidents.**  In the event of a Security Incident, each affected Party shall inform the other Party without undue delay, and in any event no later than 48 hours, and provide written details of the Security Incident, the type of personal data affected and the identity of affected Data Subjects after such information becomes known or available to the affected Party.

6.2    **AGS Obligations Following Security Incident.** Furthermore, in the event of a Security Incident as set forth above, each affected Party shall provide timely information and cooperation as the other Party may reasonably require to fulfil the other Party's data breach reporting obligations under Applicable Privacy Laws or to comply with or respond to any inquiries by a data protection authority or any lawsuit arising from the Security Incident. Each affected Party will use reasonable endeavours to mitigate and, where possible, to remedy the effects of, any Security Incident.

**7.**    **SECURITY REPORTS & INSPECTIONS**

7.1    **AGS Security Standards**.  AGS shall maintain records of its security standards. Upon Customer's written request, AGS shall provide (on a confidential basis) copies of relevant external ISMS certifications, audit report summaries and/or other documentation reasonably required by Customer to verify AGS's compliance with this DPA.

7.2    **Information Requests**. AGS shall further provide written responses (on a confidential basis) to all reasonable requests for information made by Customer, including responses to information security and audit questionnaires, that Customer (acting reasonably) considers necessary to confirm AGS's compliance with this DPA, provided that Customer shall not exercise this right more than once per year, except where otherwise required by a data protection authority.

**8.**    **INTERNATIONAL TRANSFERS**

8.1    **International Transfers of Customer Data and Business Contact Data.** Customer agrees that AGS may transfer and process Customer Data and Business Contact Data anywhere in the world, including the United States, where AGS, its Affiliates and/or its Sub-processors maintain data processing operations provided that AGS complies with this Section 8. AGS will at all times implement appropriate safeguards to protect the Customer Data and Business Contact Data, wherever it is processed, in accordance with the requirements of Applicable Privacy Laws. Where Applicable Privacy Law in the EEA, United Kingdom and/or Switzerland (collectively for the purposes of this DPA, the **"EEA"**) applies to the Customer Data and/or Business Contact Data (**"EEA Data"**), AGS shall not process or transfer (directly or via onward transfer) such data (nor permit such data to be processed or transferred) outside of the EEA, unless it first takes all such measures as are necessary to ensure the transfer is in compliance with Applicable Privacy Laws. Such measures, may include (without limitation) transferring EEA Data: (i) where AGS is located in the US, in reliance on AGS's Privacy Shield certification or (ii) in the event that AGS is not located in the US,  AGS or its US Affiliates' Privacy Shield certification is not renewed or the Privacy Shield is invalidated as a transfer mechanism, AGS shall notify Customer and enter into a data transfer agreement with Customer as follows: (a)  C2P Model Clauses (with regards to Customer Data) with Customer as the data exporter and AGS as the data importer and with **Annex A** replacing Appendix 1 of the C2P Model Clauses and **Annex B** replacing Appendix 2 of the C2P Model Clauses and further for these purposes, Customer gives AGS an instruction and mandate to sign the C2P Model Clauses with regards to the Customer Data with any data importer on behalf of and for the benefit of Customer or (b) C2C Model Clauses (with regards to Business Contact

Page **31** of 34

Data), and for purposes of the C2C Model Clauses, Customer shall be the data exporter and AGS the data importer. To the extent that AGS and/or its relevant Affiliate is located in the United States and receives and processes EEA Data under the Contract under its Privacy Shield certification, the Parties agree that such recipients shall provide appropriate safeguards for EEA Data by virtue of having certified their compliance with the Privacy Shield and AGS and/or its relevant Affiliates shall process EEA Data in compliance with the Privacy Shield Principles.

8.2      **EEA Data Exports (AGS Candidate Data).** AGS hereby authorizes any transfer of AGS Candidate Data to, or access to AGS Candidate Data from destinations outside the EEA subject to the Customer complying with this Section 8.2. To the extent AGS and/or its Affiliate transfers AGS Candidate Data protected by Applicable Privacy Law in the EEA to Customer and/or its Authorized Affiliates located in a territory outside the EEA that does not provide adequate protection for personal data (as determined by Applicable Privacy Law):

     (a)      **Privacy Shield:** and AGS and/or its Affiliates has self-certified compliance to the Privacy Shield, Customer shall (and shall procure that its applicable Authorized Affiliates) provide the same level of protection for such AGS Candidate Data as is required by the Privacy Shield Principles. Customer shall notify AGS if it makes a determination that it can no longer provide such protection and in such event, shall cease processing or take other reasonable and appropriate steps to remediate (if remediable) any processing until such time as the processing meets the level of protection as is required by the Privacy Shield Principles; or

     (b)      **No Privacy Shield:** and the AGS and/or its Affiliate has not self- certified compliance to the Privacy Shield, Customer agrees to (and shall procure that its applicable Authorized Affiliates) abide by and process such AGS Candidate Data in accordance with the C2C Model Clauses, which are incorporated by reference and form an integral part of this DPA. Customer agrees that it and/or its applicable Authorized Affiliates is a "data importer" and AGS is the "data exporter" under the C2C Model Clauses (notwithstanding that Customer and/or its Authorized Affiliates may be located outside of the EEA) and **Annex D** shall replace **Annex B** of the C2C Model Clauses.

## 9.      DELETION AND RETURN OF PERSONAL DATA

9.1      Upon Customer's request, or upon termination or expiry of this DPA, AGS shall destroy or return to Customer all Customer Data (including copies) in its possession or control (including any Customer Data processed by its Sub-processors). This requirement shall not apply to the extent that AGS is required by any applicable law to retain some or all of the Customer Data, or to Customer Data it has archived on back-up systems which AGS shall securely isolate and protect from any further processing except to the extent required by such law.

## 10.      LIABILITY

10.1      Subject to Section 10.2 of this DPA, the Parties agree that any exclusion or limitation of liability that may apply to limit each Party's liability in the Contract shall apply to each Party's and their Affiliates' liability arising under or in connection with this DPA (including any indemnity), howsoever caused, regardless of how such amounts or sanctions awarded are characterized and regardless of the theory of liability.

10.2      **If the limitations and exclusions of liability provisions in the Contract will result in either Party having unlimited liability for any loss or damage arising under or in connection with this DPA, the Parties agree that to the maximum extent permitted by applicable law, each Party's and all of its Affiliates total aggregate liability for any loss or damage (whether direct, indirect, consequential, incidental, punitive or otherwise) arising under or in connection with this DPA (including any indemnity), whether arising in contract, tort (including**

**negligence) or any other legal theory, shall not exceed a sum equal to 150% of the fees paid by Customer to AGS in the twelve (12) month period preceding the claim.**

11.     **GENERAL**

11.1    This DPA shall be governed by and construed in all respects in accordance with the governing law and jurisdiction provisions set out in the Contract, unless required otherwise by Applicable Privacy Laws.

11.2    Except for the changes made by this DPA, the Contract shall remain unchanged and in full force and effect. In the event of any conflict or inconsistency between this DPA and any other term or terms of the Contract, this DPA shall prevail in respect of the subject matter (i.e. the protection of personal data).

11.3    With effect from the effective date of the Contract, this DPA shall be deemed a part of and incorporated into the Contract so that references in the Contract to the "Agreement" shall be interpreted to include this DPA.

11.4    Clause and other headings in this DPA are for convenience of reference only and shall not constitute a part of or otherwise affect the meaning or interpretation of this DPA. Annexes to this DPA shall be deemed to be an integral part of this DPA to the same extent as if they had been set forth verbatim herein.

11.5    This DPA may be executed in two or more counterparts, each of which will be deemed an original and all of which taken together will be deemed to constitute one and the same document. The Parties may sign and deliver this DPA by facsimile or email transmission.

Recruitment Process Outsourcing Agreement -
Proprietary and Confidential: V 01 02 2019

**IN WITNESS WHEREOF, the Parties have caused this DPA to be executed by their duly authorized representatives:**

**On behalf of
AGS**

Signature:_____

**On behalf of the
Customer**

Signature:_____

Recruitment Process Outsourcing Agreement -
Proprietary and Confidential: V 01 02 2019